Filed 9/20/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| COMUNIDAD EN ACCION,<br><br>  Plaintiff and Appellant,<br><br>  v.<br><br>LOS ANGELES CITY COUNCIL et al.,<br><br>  Defendants and Respondents,<br><br>WASTE MANAGEMENT RECYCLING AND DISPOSAL SERVICES OF CALIFORNIA,<br><br>  Real Party in Interest and Respondent. | B240554<br><br>(Los Angeles County<br>Super. Ct. No. BS 126853) |

  APPEAL from a judgment of the Superior Court of Los Angeles County, James R. Dunn and Ann I. Jones, Judges.  Affirmed in part; reversed in part.

  Neighborhood Legal Services, David Pallack, Alexander Prieto; Western Center on Law and Poverty, Richard Rothschild and R. Mona Tawatao for Plaintiff and Appellant.

  Frank G. Wells Environmental Law Clinic and Sean B. Hecht for a Better Environment, Natural Resources Defense Council, and Equal Justice Society as Amici Curiae on behalf of Plaintiff and Appellant.

  Carmen A. Trutanich, City Attorney, and Timothy McWilliams, Deputy City Attorney, for Defendants and Respondents.

Armbruster Goldsmith & Delvac and R.J. Comer for Real Party in Interest and Respondent.

* * * * * *

This lawsuit concerns a community organization's -- Comunidad en Accion (Comunidad) -- challenge under the antidiscrimination statute in Government Code section 11135 (section 11135) to the City of Los Angeles's (City) siting of waste facilities in Sun Valley. We affirm the summary adjudication of the section 11135 claim because Comunidad failed to raise a triable issue of material fact supporting the inference the City's siting decision subjected residents of Sun Valley to discrimination under "any program or activity that is . . . funded directly by the state, or receives any financial assistance from the state." (§ 11135.)

Comunidad also challenged the waste facilities under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.). We reverse the dismissal of Comunidad's CEQA claims. The trial court abused its discretion in dismissing the claims based on Comunidad's one-week delay in requesting a hearing. Even though CEQA requires the expedited prosecution of claims arising under it, a trial court may grant a motion for discretionary relief based on excusable neglect. The trial court should have granted Comunidad's motion for such relief.

**FACTS AND PROCEDURE**

The genesis of this lawsuit is the City's approval of waste facilities in Sun Valley, where Comunidad alleges its predominately Latino residents are subjected to a disproportionate amount of pollution. On May 11, 2010, the Los Angeles City Council (City Council) certified an Environmental Impact Report (EIR) and approved Waste Management Recycling and Disposal Services of California Inc.'s (Waste Management) request to build a new 104,000-square-foot solid waste transfer station, an expanded materials recycling facility, and an expanded green waste processing center (collectively

2

the challenged facilities) at the Bradley Landfill site in Sun Valley. The challenged facilities all fall within the definition of solid waste facilities. (Pub. Res. Code, § 40194.)

The City's Planning Department acted as the lead agency responsible for preparing documents to ensure compliance under the CEQA. The City's Planning Department also processed the applications and approvals. The City did not consider siting the challenged facilities in another location.

### 1. The Complaint

After the City approved Waste Management's request to build the challenged facilities, Comunidad sued the City and the City Council, naming Waste Management as real party in interest. The complaint stylized both as a petition for writ of mandate and a complaint for declaratory and injunctive relief was filed on June 10, 2010. The lawsuit sought to prevent the construction of the challenged facilities in Sun Valley where members of Comunidad live.

Comunidad described the defendants as follows: "Los Angeles City Council (City Council) is the governing body of the City of Los Angeles and the lead agency that approved the construction and operation of the [challenged facilities]." According to Comunidad, the approval of the challenged facilities "has the intended and unintended effect of subjecting the residents of Sun Valley to substantially more air and groundwater pollution, and more truck traffic, odor, noise, trash and vermin than most or all other parts of the City."

### 2. The Section 11135 Claim

To show unlawful discrimination under section 11135, Comunidad was required to show that the discriminatory "program or activity . . . is funded directly by the state, or receives any financial assistance from the state." (§ 11135.)

In its complaint, Comunidad alleged: "The City Council's approval of the [challenged facilities] violates Government Code § 11135 in that the adverse effects of the [challenged facilities] will disproportionately impact a community that is predominately Latino. The City Council's approval of the [challenged facilities] subjects plaintiffs and other Sun Valley minority residents to discrimination by locating the

3

[challenged facilities] in an area with predominately Latino residents." Comunidad alleged that "the City of Los Angeles receives funding from the State of California to operate and administer its waste disposal and management programs . . . ." Comunidad sought an injunction prohibiting the construction and operation of the waste facilities because, according to Comunidad, building them in Sun Valley constituted unlawful discrimination. They sought a "judicial determination and declaration of plaintiffs', defendants' and real part[y's] respective rights and duties concerning the construction and operation of the [challenged facilities]."

The City's Planning Department is responsible for siting recycling and solid waste facilities. Comunidad did not show that any conduct related to the challenged facilities by the City's Planning Department was funded by the state. Comunidad presented evidence that the City's local enforcement agency (LEA), which currently is housed in the City's Department of Building and Safety received state funding.

The LEA is responsible for enforcing state, federal, and local law with respect to the collection, handling, storage and disposal of waste. The LEA also oversees permitting solid waste facilities. The LEA is staffed by fulltime City employees. To show that the City received state funding, Comunidad relied on the LEA's receipt of landfill grants from 2001-2011. For the last decade, the California Department of Resources Recycling and Recovery (CalRecycle) -- a state agency -- or its predecessor gave the LEA over $50,000 a year to operate the LEA's waste management program. Among other things, these funds have been used to purchase items used for inspections such as clothing, machinery, and tools, and it is undisputed such inspections would occur at the challenged facilities if they are constructed. To conduct such inspections, inspectors would use equipment and gear purchased from state funds.

The LEA used CalRecycle and other funds to pay for the services of Eugene Tseng and Associates. Among other things, Tseng and Associates reviewed the proposed design of the challenged facilities to make sure the facilities would meet state requirements and reviewed the EIR approved by the City. Tseng and Associates

4

provided input on the permit the LEA issued in July 2010, a permit which was not challenged in the complaint.

The City's Solid Waste Management Policy Plan identifies 25 agencies that have a role in the success of the City's integrated waste management plan. The plan describes the Planning Department as follows: "The City Planning Department prepares and maintains a general plan for the development of the City including elements such as land use and service systems. Privately-owned property is regulated through zoning regulation, specific plan ordinances, and State laws. Responsible for approval of sites to be used for recycling and solid waste facilities. This agency is responsible for the development of the City's General Plan." The Environmental Affairs Department was described as follows: "Designated as the local enforcement agency (LEA) for solid waste facilities located within the City, both public and private." As noted, the Department of Building and Safety now houses the LEA, not the Environmental Affairs Department.

### 3. Summary Adjudication of the Section 11135 Claim

The trial court granted summary judgment on the section 11135 claim because it concluded that the City's zoning and land use decisions were not a state funded program or activity.[1] The trial court found persuasive respondents' argument that because the "LEA was not involved in the granting of the challenged Project Approvals . . . any state funds paid to the LEA do not implicate Section 11135." In short, the trial court concluded Comunidad failed to carry its burden of showing discrimination in a state funded "program or activity," as that phrase is used in section 11135.

The trial court further concluded it did not need to consider Comunidad's motion for summary adjudication, which sought summary adjudication of the section 11135 claim on the ground that "defendants City of Los Angeles and City Council have received substantial state funding annually to operate the City's waste management program and

---

[1] The trial court granted summary judgment because the CEQA claims had been reversed. We affirm the summary adjudication (as opposed to the summary judgment) because we reverse the dismissal of the CEQA claims.

thus have a duty to comply with Government Code § 11135." Comunidad does not challenge the denial of its motion for summary adjudication in this appeal.

### 4. *The Dismissal of the CEQA Claims*

The CEQA claims followed a different track. On November 12, 2010, the court issued an order granting the City and Waste Management's motion to dismiss the CEQA claims. The court dismissed the CEQA causes of action because Comunidad's counsel failed to request a hearing within 90 days as required by Public Resources Code section 21167.4. Comunidad sought relief under Code of Civil Procedure section 473, but the trial court denied relief, finding no excusable neglect.

### DISCUSSION

### 1. *Comunidad's Section 11135 Cause of Action*

Comunidad contends that the "approval to expand [the Bradley Landfill] and site the three challenged facilities on the closed Bradley Landfill is an integral part of the City's waste management program." Further, according to Comunidad, the LEA is a part of the City's waste management program and because it received state funding the trial court erred in summarily adjudicating the section 11135 cause of action.

We conclude that the state grants made to the LEA do not raise a triable issue of material fact indicating that the alleged violations of section 11135 were part of a City program receiving state funding. To explain our conclusion, we first quote section 11135 and its implementing regulations, then review the key allegations in the complaint and critical facts, all of which are undisputed. Finally, we discuss the nature of a LEA and conclude its identity is separate from the City, even though in Los Angeles it is housed within a City department and staffed with City employees.

A.

Section 11135, subdivision (a) provides: "No person in the State of California shall, on the basis of race, national origin, ethnic group identification, religion, age, sex, sexual orientation, color, genetic information, or disability, be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is conducted, operated, or administered by the state or by any

6

state agency, is funded directly by the state, or receives any financial assistance from the state."

California Code of Regulations, title 22, section 98010 provides the definition of "program or activity" as used in section 11135: "'Program or activity' means any project, action or procedure undertaken directly by recipients of State support or indirectly by recipients through others by contracts, arrangements or agreements, with respect to the public generally or with respect to any private or public entity. Such programs or activities include, but are not limited to, the provision of employment or goods; the procurement of goods or services; the provision of education, training, health, welfare, rehabilitation, housing, or other services; the provision of cash or loan assistance; or the provision of facilities for furnishing services, financial aid or other benefits. The services, financial aid or other benefits provided under such programs or activities shall be deemed to include: [¶] (1) any services, financial aid or other benefits provided with the aid of State support, or with the aid of other funds or resources required to be expended or made available for the program to meet matching requirements or other conditions which must be met in order for the recipients to receive the State support; or [¶] (2) any service, financial aid or other benefit provided in or through a facility which is or was provided with the aid of State support or other funds or resources."

B.

Review of the allegations underlying Comunidad's section 11135 complaint is essential because the complaint delineates the scope of issues before a court on summary judgment. (*Bosetti v. United States Life Ins. Co. in City of New York* (2009) 175 Cal.App.4th 1208, 1225.) "'[A] party cannot successfully resist summary judgment on a theory not pleaded.'" (*Ibid.*, quoting *Whelihan v. Espinoza* (2003) 110 Cal.App.4th 1566, 1576.)

The complaint alleged the following violation of section 11135: "The City Council's approval of the [challenged facilities] violates Government Code § 11135 in that the adverse effects of the [challenged facilities] will disproportionately impact a community that is predominately Latino. The City Council's approval of the [challenged

7

facilities] thus subjects plaintiffs and other Sun Valley minority residents to discrimination by locating the [challenged facilities] and expansion of the greenwaste processing in an area with predominantly Latino residents." On appeal, Comunidad argues "[t]he complaint more than adequately apprises defendants that the City's decision to place three polluting waste facilities in the predominantly Latino community of Sun Valley discriminates against racial or ethnic minorities."

As the complaint and Comunidad's argument make clear, the City's siting decision was the basis for Comunidad's discrimination claim. The complaint and argument also make clear that the section 11135 cause of action was not based on any conduct by the LEA. This conclusion is further confirmed by Comunidad's motion for summary adjudication, which states: "This action challenges Los Angeles City's . . . approval of three waste facilities in the predominately Latino community of Sun Valley . . . . By locating these polluting facilities in Sun Valley, rather than in a community with fewer minorities, the City is violating Government Code § 11135 . . . , which prohibits the City, as a recipient of state funds, from implementing a program or activity in a way that disparately impacts anyone based on race, national origin or ethnicity." The trial court therefore properly focused on the City's siting decision in evaluating Comunidad's section 11135 cause of action. California Code of Regulations, title 22, section 98101, subdivision (j) further supports this analysis by making clear that the selection of sites may support a section 11135 cause of action.[2]

C.

The remaining issue is whether the City's Planning Department is part of a comprehensive waste management program such that receipt of state funds by the LEA

---

[2] California Code of Regulations, title 22, section 98101, subdivision (j) provides: "It is a discriminatory practice for a recipient, in carrying out any program or activity directly, or through contractual, licensing or other arrangements, on the basis of ethnic group identification, religion, age, sex, color, or a physical or mental disability . . . [¶] . . . [¶] (j) to make or permit selections of sites or locations of facilities: [¶] (1) that have the purpose or effect of excluding persons from, denying them the benefits of, or otherwise subjecting them to discrimination under any program or activity . . . ."

demonstrates receipt of funds by the City. To resolve that question, background into the nature of a LEA and the laws governing the City's waste management is necessary.

To effectuate its purpose of reducing, reusing, and recycling solid waste, the California Integrated Waste Management Act of 1989 (Act) required local governments to develop integrated waste management programs. (Pub. Resources Code, §§ 40050, 40052). "The Legislature intended to establish a 'comprehensive program for solid waste management.'" (*Waste Resource Technologies v. Department of Public Health* (1994) 23 Cal.App.4th 299, 305.) Initially, the California Integrated Waste Management Board oversaw the implementation of the Act, but the board has since been replaced by CalRecycle. (Pub. Resources Code, § 40400.) CalRecycle's responsibilities include approving the integrated waste management plans that all cities and counties must prepare (Pub. Resources Code, §§ 41750, 41800), regulating closed and active landfills (Pub. Resources Code, §§ 43500-43606), and administering a fund taking in $20 million annually (Pub. Resources Code, §§ 47901-48008). CalRecycle is empowered to enforce the Act using a number of corrective actions including cease and desist orders, cleanup orders, and civil penalties. (Pub. Resources Code, §§ 43300, 45000, 45014.)

The Act permits local governments to establish local enforcement agencies. (Pub. Resources Code, § 43200.) Local enforcement agencies have two primary responsibilities -- to enforce CalRecycle's rules regarding solid waste handling and to issue permits when such permits comply with CalRecycle's standards. (Pub. Resources Code, § 43209.) "The local enforcement agency has broad duties and powers (§ 43209) including the investigation of permit violations (Cal. Code Regs., tit. 14, § 18303), temporary suspension of permits ([Pub. Resources Code,] § 44305, subd. (a)), issuance of cease-and-desist orders (§ 45005), assessment of civil penalties (§ 45011), issuance of notices and orders requiring permit violations be remedied (§ 45000, subd. (a); Cal. Code Regs., tit. 14, § 18304), and in the absence of correction, initiation of judicial proceedings. (Cal. Code Regs., tit. 14, § 18304.)" (*San Elijo Ranch, Inc. v. County of San Diego* (1998) 65 Cal.App.4th 608, 613.)

9

In order for the solid waste facility to operate, the local enforcement agency must issue a permit. (Pub. Resources Code, §§ 43209, 44001.) A member of the public may request the local enforcement agency to hold a hearing to consider claims that the agency failed "to act as required by law or regulation." (Pub. Resources Code, § 44307.) "The hearing is heard by a hearing panel or officer appointed by the local '"governing body"' . . . . ([Pub. Resources Code,] § 40150; see § 44308.) The decision from this hearing may be appealed to CalRecycle (§ 45030, subd. (a)) and an individual dissatisfied with CalRecycle's decision 'may file with the superior court a petition for a writ of mandate for review thereof.' (§ 45040, subd. (a).)" (*No Wetlands Landfill Expansion v. County of Marin* (2012) 204 Cal.App.4th 573, 582 (*No Wetlands*).) A LEA cannot approve a permit without input from CalRecycle. (*Id.* at p. 581.)

CalRecycle supervises LEA's and evaluates their processes. (Pub. Resources Code, §§ 43214, subd. (d); 43220.) CalRecycle may withdraw approval for a LEA. (Pub. Resources Code, §§ 43215, 43216) If that occurs, either the local government shall designate a new enforcement agency or CalRecycle shall become the enforcement agency in the same jurisdiction as the former LEA. (Pub. Resources Code, § 43216.)

One court has described the relationship between a LEA and the board of supervisors of a city as follows: the LEA has an "independent legal existence." (*No Wetlands, supra*, 204 Cal.App.4th at p. 586.) The *No Wetlands* court held that because the Marin County LEA had an independent legal existence its decision to approve an EIR could not be appealed to the Marin County Board of Supervisors even though the enforcement agency operated within the county bureaucracy. (*Ibid*.)

Applying these principles, the LEA is separate from the City and subject to control by CalRecycle, not the City. The LEA's permit decisions must be reviewed by CalRecycle, not by the City. The LEA provided no input in the siting of the waste facilities. Although the LEA provided input on the construction of the green waste processing center, its recommendation was ignored. Additionally, the LEA must issue a separate permit from the one challenged in the complaint in order for the challenged facilities to be built. (Pub. Resources Code, § 44002.) The CalRecycle grant funds

10

received by the LEA were designated to be used only for carrying out "solid waste facilities permit and inspection program."[3] (Cal. Code Regs., tit. 14, § 18090.0) In short, the city's designation of 25 agencies and departments as part of an integrated waste management policy plan does not show that the agencies are part of a combined "program or activity" as used in section 11135.

Describing the City's entire waste management program as a "program or activity" would require finding that state funds provided to any of the following departments, all of which are included in the City's integrated waste management plan, would constitute funding of the waste management program: the Airport Department, the Board of Public Works, the Hazardous and Toxic Materials Office, the Integrated Solid Waste Management Office, the Legislative Analyst, the City Planning Department, the Community Development Department, the Community Redevelopment Agency, the Convention and Exhibition Center Authority, the Cultural Affairs Department, the Department of Water and Power, the Department of Public Works Bureau of Engineering, the Department of Public Works Bureau of Sanitation Recycling and Waste Reduction Division, the Department of Public Works Bureau of Sanitation Refuse and Collection Division, the Department of Public Works Bureau of Sanitation Refuse Disposal Division and Solid Waste Management Division, the Department of Public Works Bureau of Sanitation Wastewater Collection and Treatment, the Department of Public Works Bureau of Street Maintenance, the Environmental Affairs Department, the General Services Department, the Harbor Department, the Housing Authority, the Housing Preservation and Production Department, the library, the police department, and

---

[3] "The purpose of the LEA Grant Program is to provide grants to LEAs to carry out the solid waste facilities permit and inspection program." (Cal. Code Regs., tit. 14, § 18090.0.) "LEA grant funds shall be used exclusively for the purpose of carrying out the approved solid waste facilities permit and inspection program." (Cal. Code Regs., tit. 14, § 18090.3.) Interest on the grant funds "shall be used only for eligible grant related expenses or returned to the Board [CalRecycle]." (Cal. Code Regs., tit. 14, § 18093.1, subd. (b).)

11

the Recreation and Parks Department. Such a broad interpretation of "program or activity" is inconsistent with section 11135 or its implementing regulations.

Although the claim that the LEA's programs and the City's programs on waste management are inextricably intertwined is persuasive in that the City needs the LEA to carry out its waste management plan, their interrelatedness does not show that they are the same for purposes of applying the antidiscrimination statute. (Cf *Department of Transp. v. Paralyzed Veterans* (1986) 477 U.S. 597, 610.) In *Paralyzed Veterans*, the United States Supreme Court applied a federal antidiscrimination statute requiring federal funding as an element and rejected the argument that money to airports required airlines to comply with the antidiscrimination statute because airports and airlines were "inextricably intertwined."[4] (*Ibid*.) Comunidad's showing that the programs were related is insufficient to raise a triable issue of material fact.

Amici Curiae for Comunidad convincingly argue that "[n]o state-funded program should be able to evade the protections afforded by section 11135 simply by claiming an artificial distinction that assigns discriminatory aspects of a program to one bureaucratic unit in the regulatory structure." For example, an entity may not channel funds "into programs or activities where discrimination does not exist and designat[e] their own freed-up funds for use in programs or activities where discrimination may exist." (*Foss v. City of Chicago* (7th Cir. 1987) 817 F.2d 34, 36.) Such conduct would circumvent section 11135 and frustrate its purpose to prohibit discrimination in state-funded activities. (See Gov. Code, § 11139 [§ 11135 should not be interpreted in a manner that frustrates its purpose].) But here, as explained, the LEA and City necessarily are separate units. (*No Wetlands, supra*, 204 Cal.App.4th at p. 586.) The City's land use approval process is separate from the LEA's permitting process as is compliance with CEQA. In

---

**4**     Congress subsequently passed a law indicating that "prohibitions of discrimination against handicapped individuals shall apply to air carriers." (*Glistrap v. United Air Lines* (9th Cir. 2013) 709 F.3d 995, 1000.)

this case, no argument could be made that the City funneled money to the LEA to avoid the antidiscrimination law.

The parties' vigorous dispute regarding the implications of *People v. Levinson* (1984) 155 Cal.App.3d Supp. 13, 17, is misplaced because *Levinson* is helpful only insofar as it instructs that "the apparent legislative purpose and intent in enacting Government Code section 11135 et seq. was to prohibit discriminatory treatment of any person on the basis of categories described in section 11135 only by those charged with effectuating programs or activities which receive directly or indirectly state support." (*Id.* at p. 18.) *Levinson*'s holding that a deaf plaintiff could not assert an antidiscrimination claim based on the municipal court's failure to provide an interpreter for traffic schools indicates that the traffic school must be considered separately from the court but does not answer the relevant question here: whether funding to a City's LEA for its waste management programs constitutes direct or indirect state support to the City. Our conclusion that funding to the LEA did not constitute funding to the City is limited to the unique nature of a LEA, as an agency required to issue its own permits and one that reports to CalRecycle, not the City.

## 2. *CEQA Claims*

The trial court abused its discretion in denying Comunidad's motion for relief from dismissal. To explain this conclusion, we first summarize additional facts and procedure and then analyze the parties' legal contentions.

### A.

On June 10, 2010, Comunidad filed its complaint and petition for writ of mandate. On August 25, 2010, the parties stipulated to an extension of time for preparation and certification of the administrative record. The court issued an order requiring that the administrative record be certified no later than October 18, 2010.

On September 14, 2010, Waste Management moved to dismiss the CEQA claims on the ground that Comunidad failed to request a hearing within 90 days of filing the petition. Waste Management argued that Public Resources Code section 21167.4, subdivision (a) required Comunidad to file the request for a hearing on or before

13

September 8, 2010.  That statute provides:  In any writ of mandate proceeding alleging noncompliance with CEQA, "the petitioner shall request a hearing within 90 days from the date of filing the petition or shall be subject to dismissal on the court's own motion or on the motion of any party interested in the action or proceeding."  (Pub. Resources Code, § 21167.4.)

The next day Comunidad filed a request for a hearing.  Comunidad also sought relief under Code of Civil Procedure section 473, which permits relief from dismissal under limited circumstances.  A declaration from Comunidad's lead attorney was attached to the motion for relief.  Counsel averred that he inadvertently omitted the 90-day hearing request from his personal calendaring system.  The mistake was compounded by a family illness that required counsel to leave the state from August 26, 2010 to September 8, 2010.  In opposition to relief from dismissal, respondents argued that dismissal was mandatory and counsel's neglect was not excusable.

On October 26, 2010, the City certified the record of the administrative proceedings.

The trial court denied Comunidad's request for discretionary relief under Code of Civil Procedure 473, subdivision (b), which provides in pertinent part:  "The court may, upon any terms as may be just, relieve a party or his or her legal representative from a judgment, dismissal, order, or other proceeding taken against him or her through his or her mistake, inadvertence, surprise, or excusable neglect."

The trial court concluded that failing to calendar a deadline on a litigation calendar was not excusable neglect.  The trial court distinguished *Nilsson v. City of Los Angeles* (1967) 249 Cal.App.2d 976, 980 (*Nilsson*) in which a calendaring error was found to warrant discretionary relief because the trial court concluded that electronic litigation calendar reminders are now ubiquitous and the failure to use one fell below the standard of care.  On appeal, the parties dispute whether the trial court abused its discretion in denying Comunidad's Code of Civil Procedure section 473 motion.

14

B.

Requesting a hearing under Public Resources Code section 21167.4 is a mandatory provision of CEQA. (*Fiorentino v. City of Fresno* (2007) 150 Cal.App.4th 596, 602-603.) Comunidad filed the hearing request seven days late and only after respondents had moved to dismiss the CEQA claims.

The decision of whether to grant relief for the failure to file a timely hearing request implicates two competing public policies -- the strong preference for a trial on the merits and the policy favoring expeditious review of CEQA challenges. The preference for trial on the merits is well established. (*Zamora v. Clayborn Contracting Group, Inc.* (2002) 28 Cal.4th 249, 255 ["'It is well settled that appellate courts have always been and are favorably disposed toward such action upon the part of the trial courts as will permit, rather than prevent, the adjudication of legal controversies upon the merits'"]; see also *Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1364 ["[e]ven under fast track statute . . . preference for trying cases on the merits prevails"].) The requirement for expeditious review of CEQA claims also is well established. CEQA "contains a number of procedural provisions evidencing legislative intent that the public interest is not served unless CEQA challenges are promptly filed and diligently prosecuted." (*Nacimiento Regional Water Management Advisory Com. v. Monterey County Water Resources Agency* (2004) 122 Cal.App.4th 961, 965.) The Legislature intended that a CEQA challenge be heard within 210 days of commencement of the lawsuit. (*Id.* at p. 968.)

Notwithstanding the expedited nature of CEQA cases, CEQA does not categorically bar relief under Code of Civil Procedure section 473. (*Miller v. City of Hermosa Beach* (1993) 13 Cal.App.4th 1118, 1136; *McCormick v. Board of Supervisors* (1988) 198 Cal.App.3d 352, 359.) Courts have afforded plaintiffs relief for the failure to properly request a hearing under Public Resources Code section 21167.4, but only when such failure constituted excusable error. (*Miller v. City of Hermosa Beach*, *supra*, at pp. 1136-1137 [granting relief where attorney requested hearing on preliminary matters but not on petition operating under a mistake of law]; *McCormick v. Board of*

15

*Supervisors*, *supra*, at p. 363 [granting relief when request for hearing was made but no specific hearing date was requested].)

The test for discretionary relief under Code of Civil Procedure section 473 requires the party seeking relief to show excusable error. "'A party who seeks relief under section 473 on the basis of mistake or inadvertence of counsel must demonstrate that such mistake, inadvertence, or general neglect was excusable because the negligence of the attorney is imputed to his client and may not be offered by the latter as a basis for relief.' [Citation.] In determining whether the attorney's mistake or inadvertence was excusable, 'the court inquires whether "a reasonably prudent *person* under the same or similar circumstances" might have made the same error.['] [Citation.] In other words, the discretionary relief provision of section 473 only permits relief from attorney error 'fairly imputable to the client, i.e., mistakes anyone could have made.' [Citation] 'Conduct falling below the professional standard of care, such as failure to timely object or to properly advance an argument, is not therefore excusable. To hold otherwise would be to eliminate the express statutory requirement of excusability and effectively eviscerate the concept of attorney malpractice.' [Citation.] [¶] The party seeking relief under section 473 must also be diligent. [Citation.] Thus, an application for relief must be made 'within a reasonable time, in no case exceeding six months, after the judgment, dismissal, order, or proceeding was taken.' [Citation.] [¶] Where the mistake is excusable and the party seeking relief has been diligent, courts have often granted relief pursuant to the discretionary relief provision of section 473 if no prejudice to the opposing party will ensue. [Citations.]" (*Zamora v. Clayborn Contracting Group, Inc, supra*, 28 Cal.4th at p. 258.)

It cannot be disputed that Comunidad counsel was diligent in prosecuting this case and the motion for relief was filed a week after the hearing request, well within a reasonable time. Nor can it reasonably be argued respondents would have suffered prejudice from Comunidad's one-week delay in requesting a hearing as respondents successfully sought extensions to prepare the administrative record, which was not ready

16

at the time Comunidad requested a hearing. The vigorously disputed issue is whether Comunidad's counsel's calendaring error constituted excusable neglect.

Almost a century ago, our Supreme Court found it obvious that entering the wrong date in attorney's calendar was sufficient to warrant relief under Code of Civil Procedure section 473. (*Haviland v. Southern Cal. Edison Co.* (1916) 172 Cal. 601, 605 (*Haviland*).) The court reasoned as follows: "It will hardly be claimed that the inadvertent entry of a wrong date in the book or journal in which defendant's attorneys kept a record of the proceedings to be taken by them could not fairly have been held by the trial court to furnish sufficient ground for relief under the remedial provisions of section 473." (*Ibid.*) Relying on *Haviland* and other cases, *Nilsson* concluded that the trial court abused its discretion in denying the plaintiff an opportunity to present a claim after plaintiff's counsel missed the deadline to file a claim for damages against a city as a result of a calendaring error. (*Nilsson, supra*, 249 Cal.App.2d at p. 983.) The court found it immaterial that the attorney did not show an established office calendaring procedure. (*Id.* at pp. 982-983.) Similarly in *Flores v. Board of Supervisors* (1970) 13 Cal.App.3d 480, 483, the court stated the rule that "[w]hile not every mistake of an attorney constitutes excusable neglect [citation], calendar errors by an attorney or a member of his staff are, under appropriate circumstances, excusable."

Our high court cited *Nilsson* favorably for the proposition that "[Code of Civil Procedure] [s]ection 473 is often applied liberally where the party in default moves promptly to seek relief, and the party opposing the motion will not suffer prejudice if relief is granted." (*Elston v. City of Turlock* (1985) 38 Cal.3d 227, 233 (*Elston*), superseded by statute on another basis as described in *Tackett v. City of Huntington Beach* (1994) 22 Cal.App.4th 60, 64-65.) The *Elston* court further explained that "[i]n such situations 'very slight evidence will be required to justify a court in setting aside the default.'" (*Ibid.*) In *Elston*, the court reversed an order denying relief under Code of Civil Procedure section 473 for the failure to timely deny requests for admission because when "an attorney states that he was unaware of his duty to appear to answer because his employees misplaced papers or misinformed him as to the relevant date, relief is

17

routinely granted." (*Elston*, at p. 234.) "Unless inexcusable neglect is clear, the policy favoring trial on the merits prevails. [Citation.] Doubts are resolved in favor of the application for relief from default . . . ." (*Id.* at p. 235.)

In contrast to *Haviland* and *Elston*, in *Huh v. Wang* the court found inexcusable the error in failing to oppose a motion for summary judgment which the attorney "blamed on attorney calendaring error." (*Huh v. Wang* (2007) 158 Cal.App.4th 1406, 1412 (*Huh*).) Counsel filed no written opposition to the summary judgment motion and did not appear at the hearing on the motion. (*Ibid.*) According to the declaration of the attorney seeking relief, the error occurred "'because [counsel] was overwhelmed and disorganized,' [and] he misfiled the summary judgment motion among 'completed items' and 'did not calendar the hearing date or the due date of the opposition.'" (*Id.* at p. 1424.) The *Huh* court reasoned that the attorney's declaration failed to show either a clerical mistake made by a clerk or legal assistant and no extraordinary circumstances such as one or more attorneys leaving a law firm. (*Id.* at p. 1425.)

*Huh* relied on two cases for the proposition that a calendaring error was not excusable neglect, though neither directly supported that proposition. *Huh* cited *Todd v. Thrifty Corp.* (1995) 34 Cal.App.4th 986, 992, in which the court found the dismissal was caused by the client *not* by the attorney's calendaring error, and therefore relief was unwarranted. "Because plaintiff's counsel's mistakes, if any, did *not* cause the dismissal of the lawsuit, the trial court abused its discretion in vacating the dismissal." (*Ibid.*, italics added.) *Huh* also cited the dissent in *Yeap v. Leake* (1997) 60 Cal.App.4th 591, 603, which summarized the majority opinion as concluding a calendaring error is insufficient to warrant discretionary relief. But the majority opinion in *Yeap* explained that it was not simply a calendaring error. Instead, "counsel's failure to submit the request for trial de novo in a timely fashion was not excusable because, having already subjected his client to one calendaring error resulting in the missed arbitration, he should have moved quickly to undo the damage by requesting a trial de novo as soon as he became aware of the defense award rather than simply ordering his staff to calendar it." (*Yeap*, at p. 598.) Thus, neither *Todd* nor *Yeap* stand for the categorical proposition that a

18

calendaring error cannot constitute excusable neglect. And in *Huh*, the attorney made numerous errors that resulted in the absence of any opposition to a summary judgment motion either in writing or at the hearing.

Applying these cases here shows the trial court abused its discretion in denying Comunidad relief from default. The one-week delay in requesting a hearing was an isolated mistake in an otherwise vigorous and thorough presentation of Comunidad's claims. In contrast to *Huh*, the lead attorney made a single calendaring error, not a series of errors resulting from disorganization. This isolated mistake is indistinguishable from ones that courts have regularly granted relief (*Nilsson*, *supra*, 249 Cal.App.2d at p. 983) and any doubt is to be resolved in favor of granting relief (*Elston, supra*, 38 Cal.3d at pp. 233-235).

Transporting a date from a timeline to a calendar is a clerical type mistake, not one involving professional skill. (See *Garcia v. Hejmadi* (1997) 58 Cal.App.4th 674, 682 [distinguishing the mistakenly calendared date for a response to summary judgment from a response that was insufficient on the merits].) It is a mistake "'anyone could have made'" (*Zamora v. Clayborn Contracting Group, Inc., supra*, 28 Cal.4th at p. 258), including a person with no special training or skill (*Garcia*, *supra*, at p. 684). That the error was made by an attorney not a clerk is inconsequential as even one made by a clerk is imputable to the attorney. (*Hu v. Fang* (2002) 104 Cal.App.4th 61, 64-65.) Although electronic calendaring systems may be more prevalent than when the high court decided *Haviland* and *Elston*, the technology advancement does not change the nature of the error -- the failure to enter the date on the calendar, an error that could occur regardless of the sophistication of the calendaring system.[5]

---

[5]     Respondents argue that all counsel representing Communidad were required to file declarations. Respondents cite no support for that proposition and it is not persuasive in this case because the lead attorney who filed a declaration was the attorney responsible for filing the request for a hearing and explained why such request was untimely.

Respondents rely on *Alliance for Protection of Auburn Community Environment v. County of Placer* (2013) 215 Cal.App.4th 25 to argue the court properly dismissed the

19

**DISPOSITION**

The order dismissing the CEQA claims is reversed.  The summary adjudication of the section 11135 cause of action is affirmed.  Each party to bear its own costs on appeal.


FLIER, J.

I CONCUR:


BIGELOW, P. J.

---

CEQA claims.  In that case, the plaintiffs missed the statute of limitations for filing a claim under CEQA.  (*Alliance*, at p. 29.)  *Alliance* held that Code of Civil Procedure section 473 does not apply to dismissals for failure to comply with a statute of limitations.  (*Id*. at pp. 31-32.)  This case does not involve the failure to comply with a statute of limitations and respondents' reliance on *Alliance* is therefore misplaced.

**Comunidad En Accion v. LA City Council et al – B240554**

**RUBIN, J. - Concurring and Dissenting**

I respectfully dissent from that part of the majority opinion affirming the granting of summary adjudication of appellant's claim that the City's authorization of expansion of the Bradley Landfill site violates the antidiscrimination provisions of Government Code section 11135.[1] At a time when federal, state and local governments are calling for increased vigilance to stop imposing disproportional environmental burdens on lower income communities, the majority discards a potential tool for the enhancement of environmental justice. In so doing, the majority rejects the legislative mandate to interpret section 11135 broadly. (§ 11139.) Instead, the court's opinion holds that conduct by the City of Los Angeles which is alleged to discriminate against a predominately Latino community is not subject to California's antidiscrimination statute. I would reverse the order granting summary judgment as it relates to the section 11135 claim. I do agree with the majority that the trial court erred in granting summary adjudication of the California Environmental Quality Act (CEQA) claims, and I join in Part 2 of the Discussion in the majority opinion.

For these reasons, I would reverse outright the summary judgment.

*Introduction*

Our Legislature has enacted a number of antidiscrimination statutes during the 165 years of California's existence. (See, e.g., Gov. Code, § 12900 [employment and housing discrimination]; Civ. Code, § 51 et seq. [Unruh, Ralph and Bane Civil Rights Acts]; Ins. Code, § 1861.03 [insurance discrimination]; Civ. Code, § 1747.50 [issuance of credit cards]; Ed. Code, § 234 (Safe Place to Learn Act) [safe school environment prohibiting discrimination]; Fam. Code, §§ 7950, 8708 [foster program, adoption]; Gov. Code,

---

[1]    Except as otherwise stated, all statutory references are to the Government Code.

§ 11131 [no government meetings at facilities that discriminate]; Lab. Code, § 1735 [public works contractors may not discriminate].)[2]

Section 11135 is one of these antidiscrimination statutes. Its focus is direct as it deals with public and private sector "programs and activities" that receive state financial assistance. It bars discrimination in those programs and activities. The language of section 11135 is plain and its scope apparent:

"No person in the State of California shall, on the basis of race, national origin, ethnic group identification, religion, age, sex, sexual orientation, color, or disability, be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is conducted, operated, or administered by the state or by any state agency, is funded directly by the state, or receives any financial assistance from the state. Notwithstanding Section 11000, this section applies to the California State University."

The statute by its terms prohibits (1) discrimination based on any of ten factors; (2) in programs or activities that (a) are conducted, operated or administered by the state; (b) funded directly by the state; or (c) receive any financial assistance from the state.

The California Code of Regulations implementing section 11135 state the same:

"No person in the State of California shall, on the basis of ethnic group identification, religion, age, sex, color, or a physical or mental disability, be unlawfully denied the benefits of, or be unlawfully subjected to discrimination under any program or activity funded directly by the State or receiving any financial assistance from the State." (Cal. Code Regs., tit. 22, § 98100.) No recipient of state funds may discriminate in "carrying out any program or activity directly or through contractual, licensing or other arrangements." (*Id.* at § 98101.) "Recipient" includes local agencies with a minimum number of employees and which receive a threshold level of state funds. (*Id.* at § 98010.)

---

[2] The breadth of antidiscrimination statutes is matched only by their longevity. The original version of what is now known as the Unruh Civil Rights Act was enacted in 1901 and then reenacted in 1905 as Civil Code section 51. (Kerr's California Civil Code (1905) Bender Moss Company, § 51.)

The statute's importance is underscored by Regulations that eliminate the need to exhaust administrative remedies as a condition to judicial enforcement (*id.* at § 98003) and that expressly preempt conflicting local laws (*id.* at § 98005).

Section 11135 does not expressly mention discrimination in environmental matters or any other classification of programs or activities where discrimination is prohibited. As the statute is to be interpreted broadly (§ 11139), I see no reason, and the parties have suggested none, why the statute does not apply to the waste management activities here, provided the other requirements of the statute have been satisfied. Nevertheless, I pause briefly to discuss the role of antidiscrimination laws in the environmental field.

It is probably correct that antidiscrimination statutes have historically been applied more in areas such as housing, employment, public access, and voting than to environmental programs. Nevertheless there is an emerging awareness that government and private sector activities may have a disparately negative environmental impact on low income or minority communities. Efforts to eradicate the adverse environmental effects of projects in less affluent neighborhoods are often described as "Environmental Justice."

The California Senate and Assembly this month passed AB 1239 which embodies the goals of environmental justice. Section 1 declares:

"The Legislature finds and declares all of the following: [¶] (a) California's public health and environmental protection programs, policies, and activities should be conducted in a manner that promotes equity and affords fair treatment, accessibility, and protection for all residents, *regardless of race, age, culture, income, or geographic location*. [¶] (b) To that end, the California Environmental Protection Agency has worked for a decade to develop and implement an environmental justice initiative that ensures fair and equitable environmental policies for all residents. [¶] (c) *Through that initiative, the California Environmental Protection Agency has worked to identify those communities that are most impacted by pollution and environmental contamination*. [¶] (d) *California needs to provide the greatest level of attention and protection to those*

*communities that are at the greatest risk from those impacts.*" (Legis. Counsel's Dig., Assem. Bill No. 1239 (2010-2011 Reg. Sess.).)[3]

The City of Los Angeles, respondent here, is at the forefront of environmental justice. The Los Angeles City Attorney's Office "leads the Environmental Protection Strike Force, a group of federal, state and local agencies that work together, share resources, and exchange information to more effectively and consistently enforce environmental protection laws. The Strike Force prioritizes the prosecution of businesses and individuals whose activities and operations diminish or disproportionately affect the quality of life for Los Angeles's residents*, particularly those in close proximity to schools and those in lower income neighborhoods.*" (Los Angeles City Attorney Web site http://www.atty.lacity.org/CRIMINAL/ EnvironmentalUnit/index.htm [as of Sept. 18, 2013] italics added.)

The South Coast Air Quality Management District also has an environmental justice program: "The purpose of AQMD's Environmental Justice Program is to ensure that everyone has the right to equal protection from air pollution . . . . [¶] Environmental Justice, or 'EJ' has been defined by AQMD as: '. . . equitable environmental policymaking and enforcement to protect the health of all residents, *regardless of age, culture, ethnicity, gender, race, socioeconomic status, or geographic location*, from the health effects of air pollution.' " (South Coast Air Quality Management District Web site <http://www.aqmd.gov/ej/index.htm> [as of Sept. 18, 2013] italics added.)

A similar mission statement can be found in the homepage for the California Environmental Protection Agency: "The California Environmental Protection Agency (CalEPA) and our boards, departments, and office (BDOs) shall accord the highest respect and value to every individual and community, by developing and conducting our public health and environmental protection programs, policies, and activities in a manner that promotes equity and affords fair treatment, accessibility, and protection *for all*

---

**3** The legislation is currently awaiting signature by the Governor. (California Legislative Information Web site <http://leginfo.legislature.ca.gov/faces/ billVotesClient.xhtml>.)

*Californians, regardless of race, age, culture, income, or geographic location.*"
(Cal/EPA Web site <http://www.calepa.ca.gov/EnvJustice> [as of Sept. 18, 2013] italics added.)

Finally, the notion of environmental justice has also been adopted by the federal EPA. (EPA Web site <http://www.epa.gov/environmentaljustice> [as of Sept. 18, 2013].)

To synthesize my prefatory observations: (1) California has been a national leader in the enactment of antidiscrimination laws; (2) one of those laws is section 11135, which prohibits discrimination in programs and activities that receive state funding; (3) antidiscrimination laws are increasingly being used by government to achieve a measure of environmental justice, especially where quality of life is diminished "in lower income neighborhoods." (Los Angeles City Attorney Web site <http://www.atty.lacity.org/CRIMINAL/EnvironmentalUnit/index.htm> [as of Sept. 18, 2013.)

With this historical and legislative context in mind, I now turn to the application of section 11135 to Los Angeles's waste management program.

*Overview of City/State Participation under the Waste Management Act*

The majority has already summarized the relationship between the city and the state under the California Integrated Waste Management Act. I will therefore be brief. When the Legislature enacted this legislation in 1989, it intended to establish a "comprehensive program for solid waste management." (*Waste Resource Technologies v. Department of Public Health* (1994) 23 Cal.App.4th 299, 305.) Under the Act, waste management is a shared responsibility between the City and the state, and the City does not suggest that the authorization of the Bradley Landfill was anything other than the City playing its part in its legal duty to deal with solid waste. (Pub. Resources Code,

5

§ 40001.)[4] Public Resources Code section 40002 states: "As an essential part of the state's comprehensive program for solid waste management . . . the Legislature declares that it is in the public interest for the state, as sovereign, to authorize and require local agencies, as subdivisions of the state, to make adequate provision for solid waste handling . . . ." (Pub. Rersouces Code, § 40052 [local governments responsible for developing and implementing integrated waste management programs].)

Initially, the California Integrated Waste Management Board oversaw implementation of the Act, but the board has since been replaced by CalRecycle. (Pub. Resources Code, § 40400.) CalRecycle's responsibilities include approving the integrated waste management plans that all cities and counties must prepare, and regulating closed and active landfills. (Pub. Resources Code, §§ 41750, 41800, 43500-43606.) Under the Act, the City is obligated to designate a "Local Enforcement Agency" (LEA). (Pub. Rersouces Code, § 43202.)[5] *If the City fails to designate an L.E.A., CalRecycle becomes the enforcement agency, with the City essentially ceding power to the State.* (*Ibid.*)

The L.E.A. inspects and enforces state, federal, and local laws regarding the collection, handling, storage, and disposal of waste. In particular, the L.E.A. enforces CalRecycle's rules regarding solid waste handling, and issues permits when those permits

---

[4] Public Resources Code section 40001, subdivision (a) states, "The Legislature declares that the responsibility for solid waste management is a shared responsibility between the state and local governments. The state shall exercise its legal authority in a manner that ensures an effective and coordinated approach to the safe management of all solid waste generated within the state and shall oversee the design and implementation of local integrated waste management plans."

[5] Public Resources Code section 43202 states, "An enforcement agency may be designated by the local governing body and certified by the board to act to carry out this chapter within each jurisdiction. If an enforcement agency is not designated and certified, the board, in addition to its other powers and duties, shall be the enforcement agency within the jurisdiction, . . ."

6

comply with CalRecycle's standards.  (Pub. Resources Code, § 43209.)[6]  The L.E.A. also approves solid waste permits, as to which CalRecycle must either concur or object; assuming CalRecycle's concurrence, the L.E.A. issues the permit.  (Pub. Resources Code, §§ 43209, 44001.)  To ensure solid waste facilities comply with laws and permits governing their operation, the L.E.A. is also responsible for monthly inspections of the facilities.  (Pub. Resources Code, § 43209, subd. (a)-(b).)[7]

*The City's Role in the Expansion of Waste Facilities Here*
*And Its Claimed Effect on Appellants*

The present dispute was prompted by the decision of the City, through its City Council, to certify an Environmental Impact Report and approve the request of real party in interest Waste Management Recycling and Disposal Services of California Inc.'s (Waste Management) to build new and expanded waste management facilities at the Bradley Landfill in Sun Valley.  The City's Planning Department acted as the lead agency in the authorization process.

Appellant's complaint alleged the City of Los Angeles violated section 11135 by allowing real Waste Management to expand the Bradley landfill in a predominately Latino community already heavily burdened with more than its share of environmentally harmful businesses and facilities.  The complaint stated:  "The City Council's approval of

---

[6]  "The local enforcement agency has broad duties and powers ([Pub. Resources Code,] § 43209) including the investigation of permit violations (Cal. Code Regs., tit. 14, § 18303), temporary suspension of permits ([Pub. Resources Code,] § 44305, subd. (a)), issuance of cease-and-desist orders ([Pub. Resources Code,] § 45005), assessment of civil penalties ([Pub. Resources Code,] § 45011), issuance of notices and orders requiring permit violations be remedied ([Pub. Resources Code,] § 45000, subd. (a); Cal. Code Regs., tit. 14, § 18304), and in the absence of correction, initiation of judicial proceedings.  (Cal. Code Regs., tit. 14, § 18304.)"  (*San Elijo Ranch, Inc. v. County of San Diego* (1998) 65 Cal.App.4th 608, 613.)

[7]  Section 43218 states, "Each enforcement agency shall inspect each solid waste facility within its jurisdiction at least one time each month and shall file, within 30 days of the inspection, a written report in a format prescribed by the board."

7

the [challenged facilities] violates Government Code [section] 11135 in that the adverse effects of the [challenged facilities] will disproportionately impact a community that is predominately Latino. The City Council's approval of the [challenged facilities] thus subjects plaintiffs and other Sun Valley minority residents to discrimination by locating the [challenged facilities] and expansion of the greenwaste processing in an area with predominantly Latino residents." The approval of the challenged facilities "has the intended and unintended effect of subjecting the residents of Sun Valley to substantially more air and groundwater pollution, and more traffic, odor, noise, trash and vermin than most or all other parts of the City."

*The City Cannot Distance Itself from its Own Department*

The majority and I agree that the resolution of this appeal turns on the meaning of "program or activity" under section 11135. More precisely: Who is doing what in the waste management program? If the City's conduct in approving permits and certifying the EIR for the Bradley Landfill was part of the City's role under the Integrated Waste Management Act, and if the City receives state funding as part of that program then the statute applies.

The trial court granted summary adjudication on the stated ground that the state did not fund the conduct of which appellant complained: the City's approval under its zoning requirements of permits for Waste Management to expand the challenged facilities, and the City's approval of locating those facilities in Sun Valley. Thus, the correctness of summary adjudication turns on the scope of the "program or activity" that appellant challenges under section 11135, and the trial court correctly understood as much. At the hearing on summary adjudication, the court observed, "The plaintiffs essentially define the project [*sic: program*] or activity as the city's entire overall umbrella waste management program . . . and the city and Waste Management define it differently as the land use approval process. [¶] So the definition of program or activity is a central issue here." Because the court found the challenged "program" was limited to land-use decisions involving zoning and permitting, it concluded appellant's section

8

11135 claim failed. The court rejected appellant's contention that the participation of the City's L.E.A., a recipient of state funding, in the City's waste management activities put the City's approval of the landfill's expansion under section 11135's purview. The court reasoned that because the L.E.A. did not itself approve the permitting and expansion of the landfill, the L.E.A. did not make the City liable under section 11135. The court explained, "So if the L.E.A. is not part of the program or activity which approved this project, then the project didn't get any state funds." The court's order granting summary adjudication found the L.E.A. was "not significantly involved in the land use decision challenged by [appellant] . . . and therefore . . . its involvement in this case did not trigger the application of Section 11135."

There is no quarrel about the receipt of state funds. The L.E.A. receives state money. For the last decade, CalRecycle (or its predecessor) gave the L.E.A. over $50,000 a year to assist the City's waste management program. Among other things, those funds have been used to purchase items used for inspections such as clothing, machinery, and tools, and it is undisputed such inspections would occur at the challenged facilities if they are constructed. Because the L.E.A. receives state money, and assuming the L.E.A. has some separate existence, section 11135 applies to the L.E.A. itself. This does not appear to be in dispute; nor is it the issue this appeal needs to decide.

The majority has essentially adopted the trial court's reasoning. It holds that the City Council's action here was not part of a program or activity that receives state funding because neither the City nor City Council received state monies as part of the approval process. In my view, this conclusion suffers from two flaws. First, it assumes that the L.E.A. is an entity separate from the City of Los Angeles. The majority thus wrongly concludes that the L.E.A.'s involvement in the waste management activities targeted by Comunidad's lawsuit was immaterial. The second area in which I disagree has to do with the interpretation of "program and activity." The majority essentially tries to extract the permit issued by the City and its Planning Department from the City's waste management program and to put that permit in a realm wholly unconnected to the solid waste facilities permit issued by the L.E.A.

9

Taking these points in order, the record does not support the conclusion that the L.E.A. is a separate entity from the City and therefore the receipt of funds by the L.E.A. is not the receipt of funds by the City. The majority's only legal authority for this proposition is a reference in a CEQA case, *No Wetlands Landfill Expansion v. County of Marin* (2012) 204 Cal.App.4th 573 (*No Wetlands*). In that decision, a landfill operator in Marin County applied for revisions to a solid waste facilities permit. (*Id.* at p. 578.) The California Environmental Quality Act required the operator to prepare an environmental impact report on the proposed revisions and to submit the EIR to the CEQA "lead agency" in the landfill's jurisdiction. In Marin County, the CEQA lead agency was the Marin County Environmental Health Services; by coincidence, Marin County Environmental Health Services was also the L.E.A. empowered to enforce the Integrated Waste Management Act in Marin County although the Act was not before the court. (*Id.* at pp. 578-579.) The Marin County EHS thereafter certified the EIR of the proposed revisions to the solid waste facilities permit.

The plaintiffs in *No Wetlands* challenged the certification of the E.I.R. and took their challenge to the Marin County Board of Supervisors. (*No Wetlands, supra*, 204 Cal.App.4th at p. 579.) The issue on appeal in *No Wetlands* was whether the board of supervisors had the authority to hear the appeal from the certification of the EIR by the Marin County Environmental Health Services. *No Wetlands* held "no." (*Id.* at pp. 577, 580.) The appellate court explained "Approval of the landfill permit, and certification of the EIR for that approval, is a power vested in a local enforcement agency not the county itself. The local enforcement agency is a distinct legal entity from the county. The county board of supervisors has no authority to approve or disapprove the project at issue and thus is not a 'decisionmaking body' [as defined under CEQA] empowered to hear plaintiffs' administrative appeal. [Citations.] Plaintiffs' challenge to the adequacy of the EIR lies in the superior court, to which we remand this case." (*Id.* at p. 577.)

Seizing on the appellate court's phrase "the local enforcement agency [i.e. Marin EHS] is a distinct legal entity from the county," the majority concludes that the City's L.E.A. is a separate legal entity distinct from the City, and therefore the L.E.A.'s receipt

10

of state funds cannot be imputed to the City or the City's waste management program. The City misrelies on the quoted phrase. Language in a court decision must be understood within the context of that decision's facts. (*Ginns v. Savage* (1964) 61 Cal.2d 520, 524 fn. 2; *Plotnik v. Meihaus* (2012) 208 Cal.App.4th 1590, 1606.) In *No Wetlands*, the context was a challenge under CEQA to an EIR's certification, and the question was which public body (the Board of Supervisors or the Superior Court) had the right to rule on that challenge. *No Wetlands* looked to CEQA to answer that question, and the language in *No Wetlands* describing a local enforcement agency as a "distinct legal entity" must be understood in that context. (*No Wetlands, supra,* 204 Cal.App.4th at p. 577 [citing CEQA § 21151, subd. (c) and CEQA regulations as authority for its holding].) *No Wetlands's* holding is limited to its declaration that under CEQA the Marin County Board of Supervisors does not have reviewing authority over an EIR certified by the county's Environmental Health Services department. It is essentially an appellate review case. (*No Wetlands* at pp. 584-587.) It does not purport to analyze for purposes of antidiscrimination statutes the relationship between an L.E.A. and the city that created it. Indeed, the opinion does not mention section 11135.

In contrast to the absence of any legal authority that the L.E.A. here is separate from the City for purposes of section 11135's "program or activity," the factual record in this case shows that the L.E.A. and the city are essentially one, or perhaps more accurately, the former is part of the latter. Under the Integrated Waste Management Act, the City must designate a Local Enforcement Agency. (Pub. Resources Code, § 43202.) When the Act took effect in 1989, the City selected its Environmental Affairs Department as the L.E.A. City records reveal that the City designated that department a "Major City Agency" in the City's "Solid Waste Management Policy Plan" prepared as part of the City's compliance with the Act. Records point out that a total of 25 separate Major City Agencies, including the City Planning Department, had "a role in the success of the City meeting the goals" of its "Solid Waste Management Plan." In 2010, the City transferred the role of L.E.A. from its Environmental Affairs Department to its Department of Building and Safety. Stated slightly different, two different city *departments* have acted

11

as the L.E.A under the Act.  City departments are a subpart of the municipal government and their actions are the actions of the local government.  (*People v. Parmar* (2001) 86 Cal.App.4th 781, 799.)

Neither in 1989 nor thereafter did the City decide to participate in the creation of a new entity to act as the L.E.A., one that was comprised of representatives from the City and other local municipal entities.  It did not create or participate in a Joint Powers Authority (§ 6500 et seq.) or similar entity.[8]  It first designated the City's Environmental Affairs Department, then its Building and Safety Department as the L.E.A.  The original package of materials the City filed with the California Integrated Waste Management Board in 1999 stated that the Environmental Affairs Department was designated the L.E.A and the name of the *governing body* of the L.E.A was "Los Angeles City Council, John Ferraro – President."

Either one city department or another has at all times been the L.E.A, and it is that city department acting as a local enforcement agency under the Integrated Waste Management Act that has received state funds under the Act.  City records state plainly that the permanent L.E.A staff consists entirely of "full-time city employees from the City of Los Angeles Department of Building and Safety Code Enforcement Bureau who are currently in place and will remain in a direct role as part of the LEA program."  (City of Los Angeles Enforcement Program Plan, Dept. of Building and Safety (Aug. 2010) p. 91.)  The budget is established by the City Council with the approval of the mayor. Recovery of the cost to the City of funding the L.E.A. were to be accomplished by amendment to the Municipal Code.  (*Id.* at p. 116.)  The City's plan stated, "The projected budget for the LEA program for fiscal year 2010-2011 is projected at

---

[8]    The Los Angeles County Metropolitan Transportation Authority is an example of a governmental entity that is comprised of representatives from a number of different municipalities.  Its Board of Directors includes the Mayor of Los Angeles, two members of the Los Angeles City Council, five members of the County Board of Supervisors, and the mayor or city councilmember from four smaller cities in Los Angeles County.  (Los Angeles County Metropolitan Transportation Authority Web site <http://www.metro.net/about/board/executives> [as of Sept. 18, 2013].)

12

$1,762,618. This includes all direct and indirect costs and provides for a supplemental billing to all permitted facilities to offset increased program costs due to the increased responsibility of the City's LEA." (*Id.* at p. 118.)

In my view one cannot realistically separate the L.E.A. from the City. What the L.E.A. is doing is discharging the City's statutory obligations under the Act. (Pub. Resources Code, §§ 40001, 40052, 43202.) Stated differently the City's Building and Safety Department is acting as the local agency designated to enforce the Act.

The second flaw in the majority's reasoning, in my opinion, is its attempt to isolate the decision of the Planning Department and the City Council in approving zoning approvals and certifying the EIR from the waste management "program or activity" under section 11135. Respondents refer to the City Council decision as "actions" which are outside the waste management program, as if they exist on some separate footing divorced from the context in which they were made. The City's own Solid Waste Management Policy Plan belies the compartmentalization the majority has adopted. As far back as 1993 when the City's Environmental Affairs Department was the L.E.A., the City's report on the implementation of the California Integrated Waste Management Act stated that some 25 major city agencies were involved in the City plan. "Each of these agencies have [*sic*] a role in the success of the City meeting the goals of this plan." One of the City agencies identified in the report was the City Planning Department, the department that approved the zoning approvals in this case and referred its recommendation to the City Council. The description of the Planning Department *under the City's waste management plan was as follows*: "The City Planning Department prepares and maintains a general plan for the development of the City including elements such as land use and service systems. Privately-owned property is regulated through zoning regulations, specific plan ordinances, and State laws. *Responsible for approval of sites to be used for recycling and solid waste facilities.* This agency is responsible for the development of the City's General Plan. The CiSWMPP will also serve as the primary reference document for the Solid Waste Component of the Infrastructure Element of the General Plan." (Italics added.)

13

What the City recognized then, but from which it now tries to distance itself, is a very simple fact of City life. Many parts of the City government work together in a program as comprehensive as the City's waste management plan. To be sure, the Department of Building and Safety, acting as the L.E.A under the Act, has responsibility for issuing various permits for the actual facilities built. (Pub. Resources Code, § 43209.) But other city departments also have their role. As expressly stated in the City's own waste management plan, the Planning Department has to give its approval under zoning and other laws to allow the facility to be built or expanded. Without this approval, there would be no Bradley Landfill expansion. To separate legally the Planning Department zoning approval process and the City Council's attendant approval, and cast them aside from the permits issued by, and other statutory obligations, of the Department of Building and Safety acting as the L.E.A. is to ignore the reality of what happened and what will continue to happen under the Act. The City's permit approval and siting of the challenged facilities were not ends in themselves approved solely for their own sake, devoid of a larger context. Permits issue and facilities arise for a purpose. In my opinion, because the zoning and siting decisions were components of the City's broader, legally-mandated waste management program for which it receives state funds, section 11135 applies.

*Conclusion*

California has been a leader in the enactment of antidiscrimination laws for over 100 years. Section 11135 is a fairly straightforward statute, banning discrimination in programs and activities that receive state funds. The City receives State funds to help administer its responsibilities under the Act. State money is combined with $1,762,618 of the City's own funds so that the City's Department of Building and Safety can as the L.E.A. fulfill the City's statutory duties. The expansion of the Bradley Landfill can only be accomplished by the zoning approvals issued by the City Planning Department and approved by the City Council. Only then can the L.E.A discharge its responsibilities under the Act. To treat the actions of the City Council and the Planning Department here

14

as somehow legally detached from the other parts of the City's waste management program ignores both reality and the City's own description of its waste management program.

In my view the trial court erred in granting summary adjudication of appellant's section 11135 claim and for that reason and as stated in Part 2 of its Discussion of the majority opinion, I would reverse the order granting summary judgment.



RUBIN, J.